IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 95-30403
Summary Calendar
_____


PATRICIA HUNTER, wife;
JEROME HUNTER,

                                        Plaintiffs-Appellants,

        versus

ALLIED SYSTEMS LIMITED;
JAMES WELLER; RELIANCE
INSURANCE COMPANY,

                                        Defendants-Appellees.


_____

Appeal from the United States District Court for the
Eastern District of Louisiana
(CA-94-1726-LLM)
_____

July 15, 1996
Before GARWOOD, WIENER and PARKER, Circuit Judges.[*]

GARWOOD, Circuit Judge:

        Plaintiffs-appellants Jerome Hunter (Hunter) and his wife,
Patricia Hunter, brought this action in Louisiana state court
against defendants-appellees James Weller (Weller), Allied Systems
Limited (Allied), and Reliance Insurance Company for damages
arising out of an automobile accident involving Hunter and Weller

_____

[*]    Pursuant to Local Rule 47.5, the Court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in Local Rule 47.5.4.

on Interstate Highway 10 in New Orleans, Louisiana. The case was removed to federal district court and tried before a jury. The jury found Weller twenty percent negligent and attributed the remaining eighty percent comparative negligence to Hunter. The jury's award of various categories of damages, totaling $185,000, was reduced accordingly, and judgment was entered against the defendants for the reduced amount plus judicial interest. In the present appeal, plaintiffs-appellants raise three points of error: (1) the district court allowed the defendants to exercise their peremptory challenges for discriminatory purposes; (2) the jury erred in quantifying Hunter's comparative negligence; and (3) the jury's damage award was erroneously low.

## Facts and Proceedings Below

On December 21, 1993, Hunter was involved in an automobile accident in which his automobile left the highway and collided with a concrete median barrier. Hunter and his wife filed the instant lawsuit in Louisiana state court for damages arising from the personal injuries sustained by Hunter during this accident. The defendants removed this state action on the basis of diversity jurisdiction, and a jury trial was conducted in district court in March of 1995.

At trial, counsel for the defendants exercised peremptory challenges against three black panel members, resulting in an all white jury. Plaintiffs' counsel objected to these strikes, but the

2

magistrate judge concluded that the reasons given by the defendants for the exercise of these strikes were race neutral and that the defendants had not engaged in "purposeful discrimination."

The undisputed evidence relating to this accident included the following: (1) the accident occurred on Interstate Highway 10 (I-10) in New Orleans, Louisiana, near the exit for Read Boulevard; (2) the stretch of I-10 eastbound in which this accident occurred has three lanes; and (3) at the time of the accident, traffic on I-10 eastbound waiting to exit onto Read Boulevard was backed up in the right lane of travel.

The disputed facts are more extensive. Hunter testified that he was traveling in the left lane of I-10 when he noticed the traffic backed up in the right lane for the exit onto Read Boulevard. After reducing his speed to fifty miles per hour, Hunter testified that the tractor trailer driven by Weller (and owned by Allied), which was approximately three car lengths behind the stopped traffic in the right lane of I-10, activated its left turn signal and then traversed, in one continuous movement, from the right lane of I-10, through the center lane, and into the left lane. Hunter further testified that, at the time the tractor trailer entered the left lane, he was approximately seventy to eighty feet behind, also in the left lane; Hunter applied his brakes as the tractor trailer moved halfway into the left lane, and, at a distance of approximately forty feet from the tractor trailer, swerved onto the shoulder and struck the concrete median

3

barrier.  While Hunter testified that he was unsure whether there had been actual contact between his vehicle and the tractor trailer, he was certain that he did not lose control of his vehicle prior to the tractor trailer entering the left lane of traffic, and an independent appraisal company determined that Hunter's vehicle had no mechanical defects prior to the accident.

Hunter further testified that, following the accident, he spoke with Weller, the driver of the tractor trailer, and two other witnesses to the accident.  According to Hunter, Weller said, "I'm sorry, I just didn't see you."[1]

Angela Abraham (Abraham), one of the witnesses with whom Hunter spoke after the accident, testified that she had been in the right lane of traffic on I-10, behind Weller's tractor trailer, before Weller began his lane change.  She testified that Weller had been at a complete stop for about sixty seconds before he attempted to change lanes.  Additionally, Abraham testified that Weller's movement from the right lane to the left was continuous, and that at no time did he pull into the center lane and straighten out. When Abraham first observed Hunter, he was in the left lane of traffic, roughly straddling the left lane of traffic and the shoulder.  Finally, while Abraham testified that she did not have

---

[1]    Investigating police officer Currin Guillory (Guillory) did not arrive at the scene for approximately two and one-half hours. Weller had departed by this time in order to make his delivery; Officer Guillory therefore spoke with Weller at the delivery site. The two witnesses had likewise departed, and Hunter did not communicate their names to Officer Guillory.

a good view of this portion of the accident, it appeared to her that Hunter's vehicle and Weller's tractor trailer had made contact.

The other witness with whom Hunter spoke following the accident, Aaron Neville, Jr. (Neville), testified that he had been following Hunter in the left lane prior to the accident. He testified that Weller's tractor trailer traversed from the right lane to the left lane in one, continuous movement. He described Hunter's vehicle as approximately three car lengths from Weller when Weller entered the left lane. Neville testified that Weller's tractor at one point crossed all the way through the left lane and onto the shoulder approximately five feet. Finally, Neville testified that he and Hunter were both traveling approximately fifty miles per hour prior to Weller's lane change, and that he did not see any contact between Hunter's and Weller's vehicles.

Weller's testimony differed from the testimony of Hunter, Abraham, and Neville in several critical respects. Weller testified that he was traveling eastbound in the right lane of I-10—at a speed of approximately forty to forty-five miles per hour—when he determined that he would have to merge from the right lane into the center lane in order to avoid the traffic congestion in front of him. Without stopping, Weller slowed a little, activated his turn signal and moved into the center lane. After merging into the center lane without problem, Weller testified that he heard a squeal of tires and saw—in his mirror—a car in

5

the left lane and fifty feet or less behind him slide off the highway and into the median barrier. Weller testified that he never crossed into the left lane.[2] Finally, Weller testified that, following Hunter's accident, no one approached him to identify himself or herself as a witness to the accident.

Officer Guillory testified that, following the accident, Hunter told him that Weller had traversed from the right lane of I-10 across the center lane and into the left lane. Weller, on the other hand, told him that he had moved his tractor trailer into the middle lane and remained there. Officer Guillory also testified that his report did not indicate that Weller had mentioned having seen Hunter's vehicle sliding across the left lane, nor did Weller mention to Officer Guillory that he had been traveling in the center lane for some distance before hearing Hunter's tires squeal. Neither did Hunter advise Officer Guillory that there were any witnesses to the accident, although Hunter testified that he could not recollect whether Officer Guillory asked him about witnesses.[3]

Turning to the plaintiffs' damages, there was evidence of the following: (1) Hunter's vehicle sustained over $2,000 in property

---

[2] Weller testified that there was no contact between his tractor trailer and Hunter's vehicle. This testimony comported with the testimony of Neville. Both Hunter and Abraham suggested that they were uncertain as to whether or not contact had occurred.

[3] Officer Guillory did not testify that he specifically questioned Hunter concerning witnesses; he stated only that it was his standard procedure to ask both parties to an accident about witnesses, and that his report did not indicate that either party had mentioned any witnesses to the accident.

damages, and was declared a total loss; (2) Hunter solicited and received treatment for lower back pain soon after the accident; (3) after several months, during which time Hunter complained of lower back pain and pain "radiation" into his lower extremities, diagnostic testing revealed that Hunter had herniated discs at two levels; (4) surgery was performed on May 10, 1994, to remove the discs at both levels; (5) because this surgery resulted in a "non-union" at both levels, a second surgery was performed on July 11, 1994; (6) Hunter's spine did not "re-fuse" following this second surgery, and the two interspaces in his lower back collapsed; (7) at the time of trial, no decision had been made as to whether Hunter still had a chance of fusion or whether additional surgery would be necessary; (8) Hunter's treating physician testified that additional surgery would be likely, and estimated the cost of the procedure at $20,000; (9) as a result of his condition, Hunter was one hundred percent disabled at the time of trial; (10) Hunter's treating physician did not think that he would be able to lift air conditioners, a task necessary to his previous occupation as an air conditioner mechanic, even if he were to undergo additional surgery resulting in "a good fusion"; (11) Hunter's treating physician was not willing to testify that it was more probable than not that Hunter would not be able to work as a watchman, or in any other job in which he was not required to do any repetitive lifting, stooping, or bending and in which he would not have to sit for long periods of time; (12) Hunter's condition made it difficult or

7

impossible for him to engage in certain hobbies, chores, and other activities that he had participated in prior to the accident; and (13) Hunter's condition had adversely impacted his marital relationship.

Following trial, the jury, in answer to special interrogatories, found that Weller and Hunter had each been negligent so as to proximately cause Hunter's injuries, that Weller's negligence was twenty percent of the total and Hunter's was eighty percent. The jury found Hunter had sustained a total of $180,000 damages and his wife a total of $5,000 in loss of consortium.[4] After reducing these damage awards to account for Hunter's comparative negligence, the district court entered judgment against the defendants for a total of $37,000, plus judicial interest. Plaintiffs appealed.

---

[4] The jury found the following damages:

| | |
|---|---|
| Past, Present and Future Physical Pain | $25,000.00 |
| Permanent Disabilities | $25,000.00 |
| Past, Present and Future Medical Expenses | $65,000.00 |
| Past, Present and Future Mental Pain and Suffering | $25,000.00 |
| Impaired Earning Capacity | $40,000.00 |
| TOTAL (damages of Hunter) | $180,000.00 |
| (Patricia Hunter's) Loss of Consortium | $5,000.00 |

No complaint on appeal is made respecting the form or content of the damages submission.

**Discussion**

I.   The *Batson* Claim

A trial court's finding as to whether or not one party has established "purposeful discrimination" by the opposite party in the exercise of its peremptory challenges constitutes a finding of fact.  *See Batson v. Kentucky*, 106 S.Ct. 1712, 1724 n.21 (1986).[5] We review the district court's findings of fact for clear error, reversing such findings only when we are left with a definite and firm conviction that a mistake has been made.  *See Peavey Co. v. M/V ANPA*, 971 F.2d 1168, 1174 (5th Cir. 1992).  Moreover, where the district court's factual findings turn largely on its evaluation of credibility, those findings are ordinarily afforded great deference.  *See Batson*, 106 S.Ct. at 1724 n.21.

This Court has held that a *Batson* challenge to the exercise of peremptory strikes involves three steps:

> "(1) the defendant establishes a prima facie case by raising an inference that the prosecution struck potential jurors solely because of race; (2) The burden then shifts to the prosecution to articulate legitimate, clear, and reasonably specific explanations for each of the challenged strikes.  At this stage, the prosecution need only give a facially valid explanation; (3) At the third stage, the trial court determines whether the defendant has proven purposeful discrimination.  The appellate court reviews this finding for clear error, giving great deference to the trial court's finding that the prosecutor's explanation was credible."  *United States v. Wallace*, 32 F.3d 921, 925 (5th Cir. 1994) (citations omitted).

---

[5]   The *Batson* rule was extended to civil cases in *Edmonson v. Leesville Concrete Company, Inc.*, 111 S.Ct. 2077 (1991).

9

The Supreme Court has clarified that "The second step of this process does not demand an explanation that is persuasive, or even plausible." *Purkett v. Elem*, 115 S.Ct. 1769, 1771 (1995). "At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* (citation omitted). The Court also observed that what was required of a "legitimate reason" for exercising peremptory challenges was not that the reason make sense, but that it not deny equal protection. *Id.* (citation omitted).

In the present case, defendants' counsel exercised their three available peremptory challenges to strike three black panel members. The resulting jury did not include a black juror.[6] Plaintiffs' counsel objected to these strikes as discriminatory and violative of *Batson*.

A.   Juror Number Eight

During *voir dire*, juror number eight, Ronald Arceneaux, stated that he was employed by the United States Postal Service as an "equal opportunity counselor, Spanish investigator." In giving explanation for the strike of juror number eight, defendants' counsel asserted that number eight was an investigator of

---

[6]    Defendant Weller is white, and plaintiffs Jerome and Patricia Hunter are black.

10

discrimination claims with the EEOC, and, while there were no discrimination claims in the present case, "[number eight] would be subject to questioning a claim being asserted by [plaintiff Hunter]. He's an investigator of claims of discrimination, and there may be claims that could be construed to be discriminatory because of [Hunter's] race."

The court determined that, while the strike of juror number eight was based upon "this juror's work with people who might have a race-based discrimination type complaint, it is not one, from what I can tell, that is based solely on the fact that Mr. Arceneaux also is black, but that he investigates prospective black individuals." The court further observed that "He could have been white and he would have been challenged. So, in effect, it is not a race-based reason for the excuse."

The reason offered by the prosecution was sufficiently specific, and we need not consider whether it was persuasive, plausible, or even "made sense". We do not find the prosecutor's stated reason to be facially invalid. In *United States v. Wallace*, this Court upheld the prosecution's striking of a black panel member based solely on the fact that the panel member was a social worker. 32 F.3d at 925-26. After examining defense counsel's proffered "race neutral" explanation—that juror number eight was "an investigator of discrimination claims," and that certain facts and circumstances of this case might play upon the sympathies

11

instilled by his occupation—the district court found that number eight was not struck for discriminatory reasons. We find no basis for reversal.[7]

B. Juror Number Four

During *voir dire*, after the court invited jurors to approach the bench and (privately) discuss anything that might affect their ability to act as jurors, juror number four, Luann Revader, approached the bench and spoke briefly with the magistrate judge. In offering an explanation for striking juror number four, counsel for defendants asserted that number four "has a medical problem, and although she can tell the Court when she's having a problem, she does indicate, first, a problem, and it could be discomforting

---

[7] Plaintiffs argue that the district court's reason for upholding defendants' challenge to juror number eight—that the panel member "investigates prospective black individuals"—was erroneous. Plaintiffs contend that number eight was a "spanish investigator". This contention may speak to the persuasiveness or plausibility of the defendants' proffered explanation for striking number eight, but, even so, it does not undermine the facial validity of the defendants' "race neutral" explanation.

This Court has held that "the ultimate inquiry for the judge is not whether counsel's reason is suspect, or weak, or irrational, but whether counsel is telling the truth in his or her assertion that the challenge is not race-based." *United States v. Bentley-Smith*, 2 F.3d 1368, 1375 (5th Cir. 1993). And, in making this determination, the court need not reject out of hand "race neutral" explanations that lack a specific factual basis; "that is a call for the judge to make, based upon his or her evaluation of such things as the demeanor of counsel, the reasonableness of the justifications given, and even the court's personal observation of the venireman." *Id.*

12

to her."[8]  The court found this to be a "perfectly non-racial reason[]" and we agree.

C.    Juror Number Five

In explaining their decision to strike juror number five, Kimberly Dickerson, defendants observed that number five worked as a registered nurse in an intensive care unit, taking care of patients suffering from injuries of the type sustained by the plaintiff.  Defendants' counsel argued that "She is not an unbiased juror.  I don't know if she's biased or not, but their position is akin to somebody with specialized training and knowledge who may or may not accept what the witnesses say."

When asked by the court to explain why juror number five was struck and why another juror employed within the medical field was not, defense counsel noted that the other panel member identified by the court was a secretary to a general surgeon.  "She has no training whatsoever as a medical care giver or care provider.  She types reports.  She doesn't work around patients, as [Hunter] is. She doesn't care for patients who have undergone surgery."  We find no grounds for reversing the district court's determination that the defendants had given legitimate, "non-racial reasons" for

---

[8]    Apparently, juror number four's undisclosed medical problem was the subject of her private discussion with the magistrate judge during *voir dire*.  In objecting to the defendants' explanation for striking number four, plaintiffs' counsel stated that "I believe [juror number four] indicated to Your Honor that it was no problem, that she would let me know if there was a problem, to take whatever medication she needed.  I wasn't a party to that conversation, but that was my appreciation of it."

13

striking juror number five.

Finally, the plaintiffs emphasize that the defendants exercised all three of their peremptory challenges to excuse black veniremen, and that the resulting jury was comprised solely of white persons. In *United States v. Terrazas-Carrasco*, 861 F.2d 93 (5th Cir. 1988), this Court recognized that a party's claim of purposeful discrimination "might be stronger" in such a situation. *Id.* at 95. However, in light of the facially valid "race neutral" explanations tendered by the defendants in the present case, and the fact that these explanations were not equally applicable to any white venireman not struck by defendants, we hold that the district court did not clearly err in accepting the defendants' reasons for striking jurors four, five, and eight.

II. The Jury's Apportionment of Fault

In reviewing a jury verdict, this Court must determine whether the record contains competent and substantial evidence fairly tending to support the verdict. *See Stewart v. Thigpen*, 730 F.2d 1002, 1007 (5th Cir. 1984). We will not reweigh the evidence or set aside a jury verdict——even if more reasonable inferences or conclusions could be drawn from the evidence—if there is a reasonable evidentiary basis for the verdict. *See Wood v. Diamond M Drilling Co.*, 691 F.2d 1165, 1168 (5th Cir. 1982), *cert. denied*, 103 S.Ct. 1523 (1983).

Plaintiffs contend that the jury's assignment of eighty

14

percent comparative negligence to Hunter was manifestly erroneous and unsupported by any competent or substantial evidence. Among other things, this contention overlooks the testimony of the defendant, James Weller. Weller testified that, in executing his lane change, he slowed down, activated his turn indicator, and moved from the right lane of traffic into the center lane without difficulty. Weller further testified that, after merging into the center lane, he heard a squeal of tires and saw—in his mirror—a car that was in the left lane and fifty feet or less behind him slide off the highway and into the median barrier.[9] Weller testified that, throughout this episode, he never entered the left lane of traffic. The testimony of one of the parties to an accident, even if self-serving, can certainly constitute competent

---

[9]     This testimony implicates the tenet of Louisiana law that:

> "[A] motorist owes to the travelling public the duty of remaining in his own lane of traffic and . . . he must be held strictly accountable for all damages resulting [from his departure from this lane] unless he clearly exhibits that his conduct in no wise contributed to the accident . . . [H]e must establish his freedom from all fault by convincing proof." *Rizley v. Cutrer*, 95 So.2d 139, 142 (La. 1957).

Under this principle, the burden of proof, normally placed upon the plaintiff in a personal injury case, falls instead on the defendant when a defendant motorist leaves his own traffic lane and thereby causes an accident. *Id.; see also Ferrell v. Fireman's Fund Ins. Co.*, 650 So.2d 742, 746-47 (La. 1995) (because defendant motorist had duty of remaining in her own lane, controlling her own vehicle, and preventing it from leaving her own lane and colliding with a bridge railing, the burden of proof was on the defendant "to show that she was not guilty of any dereliction, however slight").

and substantial evidence.[10]

Plaintiffs argue that Weller's testimony is undermined by the testimony of Hunter and two other witnesses, Abraham and Neville. These three persons testified that Weller had not completed his lane change once he was in the center lane, but that he continued from the center lane into the left lane, thereby forcing Hunter to swerve off of the highway in order to avoid a collision. However, plaintiffs fail to demonstrate that the jury was compelled to dismiss Weller's testimony in light of this testimony from Hunter, Abraham, and Neville.

It appears that the jury must have embraced some portion of the testimony favoring Hunter as the jury found that Weller's (twenty percent) negligence was a proximate cause of Hunter's accident. However, contrary to the plaintiffs' contentions, this assignment of negligence does not necessarily indicate that the jury rejected Weller's testimony in its entirety. In piecing together the factors contributing to Hunter's accident, the jury apparently drew from the testimony offered by both sides. And,

---

[10] Plaintiffs suggest that Weller's testimony should be discounted because it was "self-serving." In *Dean v. Ford Motor Credit Co.*, 885 F.2d 300 (5th Cir. 1989), this Court observed that:

> "[C]haracterizing a party's testimony as 'self serving' is not useful to the court. In a lawsuit, where each party is attempting to advance his own cause and protect his own interests, we are scarcely shocked when a party produces evidence or gives testimony that is 'self-serving.'" *Id.* at 306.

particularly in view of the evidence demonstrating inconsistencies in the testimony favoring Hunter, we cannot conclude that there existed no evidentiary basis for the jury's allocation of fault.

III. The Jury's Award of Damages

We will not reverse a jury award of damages on grounds of claimed inadequacy unless the amount awarded is clearly less than what all reasonable jurors would necessarily have found to have been proven by a preponderance of the credible evidence. *See Pressey v. Patterson*, 898 F.2d 1018, 1024 (5th Cir. 1990); *In re Air Crash Disaster*, 767 F.2d 1151, 1155 (5th Cir. 1985).

In the present case, the plaintiffs contend that three of the categories of damages awarded by the jury were erroneously low: (1) $75,000 for "general damages";[11] (2) no damages for future medical expenses;[12] and (3) $5,000 (awarded to Mrs. Hunter) for loss of consortium.[13] While it may be that the evidence adduced at trial would sustain larger awards in these three categories, the jury's factual findings are not clearly erroneous.

---

[11] The jury awarded plaintiffs $25,000 for "past, present and future physical pain and suffering," $25,000 for "permanent disabilities," and another $25,000 for "past, present and future mental pain and suffering."

[12] The jury awarded plaintiffs $65,000 for "past, present and future medical expenses." Plaintiffs claim that Hunter's past medical expenses totaled approximately $65,000, and therefore that the jury had awarded plaintiffs nothing for future medical expenses.

[13] The plaintiffs do not challenge on appeal the jury's ($40,000) award of damages for Hunter's impaired earning capacity.

In arguing that the jury's $75,000 award for "general damages" (see note 11) was abusively low, the plaintiffs cite several decisions in which Louisiana appellate courts identified the "lowest amount" which the jury could have reasonably awarded the respective plaintiffs. However, in rendering these decisions, the appellate courts clarified that such findings—involving the sufficiency of trial court damage awards—turned entirely on the specific circumstances of the individual cases. Therefore, these decisions provide no formulas for assessing the "adequacy" of damages. *See Use v. Use*, 654 So.2d 1355, 1364 (La.App. 1st Cir. 1995); *Hoback v. KMart Corp.*, 628 So.2d 1258, 1262 (La.App. 3rd Cir. 1993); *see also Reck v. Stevens*, 373 So.2d 498, 501 (La. 1979) (only after it is determined from facts of instant case that jury erred in awarding certain damages "is a resort to prior awards appropriate" for determining acceptable award in present case). *See also Allen v. Seacoast Products, Inc.*, 623 F.2d 355, 364 (5th Cir. 1980) ("each case must be determined on its own facts").

In the present case, evidence was presented that: (1) at the time of trial, Hunter had not reached "maximum improvement" following his second surgery, and further recuperation was possible; (2) Hunter's treating physician did not know at the time of trial whether additional surgery would be necessary;[14] and (3)

[14] Hunter's treating physician also testified that Hunter would probably have a thirty percent "total body disability" if additional surgery were in fact performed in order to fuse the two

18

Hunter's treating physician agreed that it was premature at the time of trial to suggest that Hunter would not return to some form of employment. After observing Hunter during trial and listening to all of the evidence in the case, the jury awarded Hunter $75,000 in "general damages". The jury did not clearly err in making this factual determination.

Turning to the plaintiffs' claim that the jury erred by not awarding any sum for future medical expenses, the burden at trial was on the plaintiffs to show that such expenses more probably than not would be incurred. *See Bernard v. Royal Ins. Co.*, 586 So.2d 607, 613 (La.App. 4th Cir. 1991). Hunter's treating physician testified that, if Hunter were to remain unstable and he continued to have "movement" in his spine, then additional surgery would be probable. And, this physician further testified that the failure of Hunter's back to fuse after six months demonstrated that Hunter's "prospects" of avoiding additional surgery were "not very good." However, in view of the evidence presented that Hunter had not reached "maximum improvement" at the time of trial, and that his treating physician was willing to wait an additional four months before making a decision regarding additional surgery, we cannot conclude that the jury clearly erred in its award of $65,000 damages for past, present, and future medical expenses even though there was evidence from which the jury could have found as much as

lumbar levels. Plaintiffs suggest that this was an optimistic estimate even if additional surgery were not required.

$65,000 past and present medical expenses alone.

Finally, plaintiffs presently challenge the jury's award of $5,000 to Mrs. Hunter for her loss of consortium.  The jury heard evidence and valued Mrs. Hunter's loss at $5,000.  Based on the general evidence presented in this case addressing the impact of Hunter's injuries on the plaintiffs' marital relationship, this finding was not clearly erroneous.

## Conclusion

For the foregoing reasons, the district court's judgment is

AFFIRMED.